FILED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)

2014 JUN -6  A 11: 45

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

ANGELA M. SERCER, )
)
Plaintiff, )
)
v. ) Civ. A. No. 1:14CV681
) CMH/JFA
ERIC H. HOLDER, in His Official Capacity as )
Attorney General of the United States, ) JURY TRIAL DEMANDED
)
Defendant. )

## COMPLAINT

(UNLAWFUL DISCRIMINATION BASED UPON SEX AND
UNLAWFUL RETALIATION FOR PRIOR PROTECTED ACTIVITIES
IN FEDERAL EMPLOYMENT)

COMES NOW the Plaintiff in this proceeding, Angela M. Sercer, appearing by and through counsel, and alleges as follows:

### JURISDICTION

1. Jurisdiction in this matter is based upon Title VII of the Civil Rights Act of 1964, as amended, codified at 42 U.S.C.A. Section 2000(e), *et seq.*, in that Plaintiff Sercer was unlawfully discriminated against based upon her sex (female) by her Federal Government employer, the Federal Bureau of Investigation (FBI), a subordinate Agency of the United States Department of Justice (DOJ); and subsequently was subjected to unlawful retaliation for her prior protected Equal Employment Opportunity activities, all while employed by the United States Government.

1

# VENUE

2. Venue in this matter properly lies with the United States District Court for the Eastern District of Virginia, Alexandria Division, insofar as Defendant employs Plaintiff Sercer in the area of Northern Virginia, within the Commonwealth of Virginia; the majority of alleged discriminatory and retaliatory acts of Defendant against Plaintiff Sercer took place within this venue; and, on information and belief, numerous records concerning Plaintiff's employment are substantially maintained in this venue. 28 U.S.C. Section 1391 and 42 U.S.C. Section 2000e5(f).

# PARTIES

3. Plaintiff Angela M. Sercer is a female Supervisory Special Agent (SSA) employed by the Federal Bureau of Investigation (FBI), an Agency within the United States Department of Justice (DOJ). Ms. Sercer resides in Stafford, Virginia.

4. Defendant Eric A. Holder is the Attorney General of the United States and serves as the Head of the United States Department of Justice, which governs for all purposes the Federal Bureau of Investigation, and is sued in his official capacity only.

5. As part of his official duties, Mr. Holder is responsible for the actions of DOJ and its subordinate Agency, the FBI.

# EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Subsequent to certain of the actions set forth herein, SSA Sercer initated EEO counseling on November 5, 2012. Because the informal counseling process failed to remedy her various EEO complaints, SSA Sercer filed a complaint of unlawful discrimination and retaliation for prior protected EEO activity with the FBI's Office of Equal Employment Opportunity Affairs (OEEOA) on March 4, 2013. This complaint

was docketed as FBI-2013-00121. By letters dated June 7, 2013, and August 14, 2013, the FBI OEEOA advised SSA Sercer that the following allegations had been accepted for investigation:

> "Whether [SSA Sercer] was discriminated against and harassed based on sex (female) and reprisal when from June 2010, through November 26, 2012:
>
> "1) Sexually explicit comments were made to her and derogatory comments were made regarding her behavior and work performance;
>
> "2) She was not informed of or included in meetings regarding projects;
>
> "3) She discovered that her personal drop folder contained negative and false comments;
>
> "4) On October 25, 2012, she received an "Excellent" rating on her 2012 Performance Appraisal Report (PAR), with "Fully Successful" ratings in the Critical Elements of "Relating with Others and Providing Professional Service" and "Maintaining High Professional Standards";
>
> "5) Her subsequent PAR grievance was denied; and
>
> "6) She was transferred to another unit. Ex. 9." [Citation in original.]

8. On February 19, 2014, the FBI Report of Investigation (ROI) regarding SSA Sercer's EEO complaints was forwarded to Plaintiff Sercer and her legal counsel.

9. On February 25, 2014, SSA Sercer elected to not have her case referred to an Administrative Judge of the Equal Employment Opportunity Commission (EEOC), and demanded that the ROI be forwarded to the US Department of Justice for issuance of a Final Agency Decision (FAD). On information and belief, the FBI OEEOA then forwarded the initial ROI to the Department of Justice for issuance of the FAD.

10. By letter dated May 9, 2014, the FBI OEEOA notified SSA Sercer and her counsel that an attachment to the initial ROI had been inadvertently omitted from the service copy of the ROI provided to SSA Sercer and her counsel. A copy of the Amended ROI was again provided to SSA Sercer and her counsel at that time, with information provided that the Amended ROI also was being provided to DOJ for issuance of the FAD.

11. By letter dated May 23, 2014, The Complaint Adjudication Office of DOJ advised SSA Sercer and her counsel that the ROI had been received and that a "Final Decision on your complaint will be rendered as soon as possible."

12. Pursuant to EEO Regulations, the Department of Justice has 60 days to timely render its FAD subsequent to receipt of the Claimant's file from the FBI. As of this date, over 90 days have passed since the forwarding of Plaintiff's ROI to DOJ for the issuance of the FAD, although the date of DOJ receiving the Amended ROI cannot be determined.

13. This case is timely filed with the United States District Court since over sixty (60) days has passed without the issuance of the FAD by DOJ and without receipt of the FAD by Plaintiff Sercer. Moreover, more than 180 days has passed since the filing of Plaintiff's formal EEO Complaint, without final action having been taken by the Defendant, thus resulting in the right to bring this matter to the United States District Court.

### FACTUAL ALLEGATIONS; BACKGROUND

14. Paragraphs 1 through 13 are herein incorporated by reference.

15. Plaintiff Sercer entered employment with the FBI on March 10, 2002. At the time of her employment, Plaintiff Sercer had a significant level of education and

employment experience. This includes undergraduate and graduate degrees in Criminal Justice, and previous work experience as a Special Agent with the Bureau of Alcohol, Tobacco, and Firearms, where she conducted firearms, arson and explosives investigations. SSA Sercer's work experience also includes employment as an Adult Probation Officer, and a Social Worker working with delinquent children and investigating child abuse and neglect. Upon entering the FBI, SSA Sercer was assigned to the Washington Field Office where she investigated domestic and international terrorism matters as well as criminal matters. She was also a member of the Evidence Response Team.

16. In March 2010, Plaintiff Sercer was assigned to the FBI's Behavioral Analysis Unit (BAU) I, Investigative Operations Support Section (IOSS), Critical Incident Response Group (CIRG).

17. Four BAUs provide operational support to FBI field offices and other law enforcement entities in the investigation of complex and time-sensitive crimes, typically involving acts or threats of violence.

18. Following her assignment to BAU I, SSA Sercer attended three months of Phase I classroom training, and several additional months of Phase II on-the-job training. Upon successful completion of Phase II training, SSA Sercer was awarded certification in Behavioral Analysis.

19. Within BAU I, SSA Sercer was assigned to provide support to investigations involving Domestic Terrorism (DT) matters. Because of her background and training, SSA Sercer was assigned to be the DT Program Manager. Because of her solid experience in International Terrorism (IT), SSA Sercer also was consistently assigned IT

5

cases throughout her tenure at BAU I. Of importance, SSA Sercer was assigned as the Lone Offender (LO) Research Project Manager, largely because of the link between LOs and Domestic Terrorism. An LO is associated with an act conceived or executed by one or a few individuals, not operating under the direction or influence of an organized group. While the subject may reach out to others for assistance, the LO is the primary architect of the operation, and his/her effort is self-generated rather than directed by others. The focus is on a subject who consciously accepts the use of lethal violence in furtherance of an ideological, political, social, or religious cause; and the act may result in homicide, or likely would have, had unforeseen circumstances not occurred.

20. SSA Sercer had actively sought her assignment to BAU I, and considered it to be a critical step to achieve her FBI career goals. Based upon her education, experience and exceptional past duty performance, SSA Sercer was ideally suited for the Behavioral Analysis and Profiler positions -- and considered her assignment to be the culmination of a lifelong ambition.

21. Soon after SSA Sercer was assigned to BAU I, Scott Stanley was appointed as Unit Chief (UC), in which position he served as SSA Sercer's immediate supervisor.

22. Shortly after UC Stanley's arrival in BAU I, Plaintiff Sercer began to notice a bias against female Special Agents, and preferences given to male Special Agents, within BAU I by UC Stanley. SSA Sercer was specifically precluded by UC Stanley from moving forward with her assigned LO Research Project, while male special agents within BAU I were participating in meetings and deployment activities related to LOs. SSA Sercer was deliberately excluded by UC Stanley from such participation.

23. In late 2011, SSA Sercer met with Assistant Section Chief (ASC) Joe Rivers of CIRG, complaining that UC Stanley was precluding her from participating in critical LO assignments; ASC Rivers refused to take any actions to correct the situation.

24. UC Stanley also refused to consider SSA Sercer for Outstanding ratings for the 2011 rating year, stating that she could not be expected to receive Outstanding ratings, as they were "reserved" for people who would receive Qualitative Step Increases (QSIs). On information and belief, however, Outstanding ratings and QSIs were awarded to male SSAs within BAU Unit I by UC Stanley.

25. As a result of the observation of bias by UC Stanley and other females within BAU I, three female Special Agents and one male Special Agent in BAU I, including Plaintiff Sercer, met with two BAU I male colleagues to address their perceptions and observations of UC Stanley's conduct. During this meeting SSA Sercer expressed her observations that she was being thwarted by UC Stanley in her role as LO Project Manager; including being excluded from cases and meetings dealing directly with her area of professional responsibility.

26. In a subsequent meeting with UC Stanley, Plaintiff Sercer was told by UC Stanley that because of her comments at the meeting, SSA Sercer had been identified by other BAU I SSAs as the cause of the majority of "issues" or problems in the unit.

27. In February 2012, following additional instances of discriminatory and retaliatory treatment against her by UC Stanley, Plaintiff Sercer requested and received a meeting with CIRG Section Chief Juan Molina. At this meeting, SSA Sercer identified the biased and discriminatory treatment she was receiving from UC Stanley, particularly regarding her management of the Unit DT and LO Programs. While SC Molina advised

SSA Sercer that he would look into the situation and get back to her, he never responded to Plaintiff Sercer regarding her concerns.

28. Unknown to Plaintiff Sercer, ASC Rivers and UC Stanley had met with SC Molina prior to the cited meeting. Immediately thereafter, ASC Rivers and UC Stanley started documenting false information about the duty performance of SSA Sercer, including fabricated comments about SSA Sercer's emotional state. Such documents were placed in a personnel "drop folder" which was maintained by UC Stanley and kept secret from SSA Sercer.

29. On March 13, 2012, ASC Rivers and UC Stanley attempted to force Plaintiff Sercer to alter the content of an official FBI document. SSA Sercer appealed to SC Molina stating that the circumstances in Unit 1 had become untenable and had interfered with important operational matters; SSA Sercer had made contact with an EEO representative to seek relief from the situation; and that she would appreciate the opportunity to discuss the issues with him. At an impromptu meeting called by SC Molina on March 14, 2012, SC Molina met with SSA Sercer, but with ASC Rivers also attending the meeting. At that time, SC Molina stated that he was not going to address the concerns of SSA Sercer, and that he was angry that SSA Sercer had refused to change the referenced document when directed to do so. Despite SSA Sercer's explanation as to the illegality of what she had been told to do, SC Molina stated that it was apparent that SSA Sercer was not willing to follow orders; that she had to do what management said to do without question; and if she did not do it, she would face charges of insubordination.

30. Following the threats of SA Molina and ASC Rivers, SSA Sercer changed the document -- but reported the misconduct to the CIRG Ethics Coordinator and Chief

Division Counsel (CDC), Ken Gross. Counsel Gross agreed that what SSA Sercer had been directed to do was against FBI policy and inappropriate, and would report the misconduct to his chain of command. Subsequently, on March 30, 2012, CIRG personnel received notification that ASC Rivers and UC Stanley were abruptly being transferred -- with UC Stanley stepping down to a GS-13 assignment, and ASC Rivers being laterally transferred to the CIRG Aviation Unit. SSA Sercer was never informed whether these actions were related to her conversation with Counsel Gross about the inappropriate documentation actions she had been directed to take.

31. Subsequently, UC Slater was appointed to be the Acting/ASC. Subsequently, in approximately August 2012, UC Slater was appointed to be the new BAU I Unit Chief. UC Slater has been the individual named in numerous other complaints of unlawful discrimination against female special agents, and accused of instances of unlawful retaliation against certain FBI Senior Special Agents for prior protected EEO conduct. UC Slater continued the pattern of discrimination and retaliation against Plaintiff Sercer upon his assumption of UC duties within BAU 1. UC Slater refused to permit SSA Sercer to perform any of her LO duties, and told one of her male colleagues that he was displeased with SSA Sercer, and that she had a "long history of problems and confrontations." On information and belief, these allegations were false and concocted in furtherance of unlawful discrimination and retaliation against SSA Sercer.

32. Plaintiff Sercer requested a meeting with UC Slater which took place on September 7, 2012, to discuss her ongoing concerns regarding her LO duties and other adverse actions being taken against her; as well as general Unit organizational issues. At that meeting, UC Slater stated that he needed additional time to consider SSA Sercer's

various recommendations. At no time during this meeting did UC Slater express concerns about SSA Sercer's performance or interactions with others.

33. Six days later, on September 13, 2012, a reorganization of certain selected elements of the NCAVC was announced. Plaintiff Sercer's Lone Offender assignment was rescinded, and transferred to another CIRG Unit -- the same Unit to be occupied by UC Slater following the reorganization. SSA Sercer believed the transfer of her LO assignment to be a direct result of discrimination and retaliation for her prior EEO activities.

34. UC Mark Nichols was named the new Unit Chief of BAU Unit I following the "reorganization." In this position for less than three weeks, UC Nichols became responsible for preparing the annual PAR for SSA Sercer for the period ending September 30, 2012.

35. The resulting PAR was drafted by the prior Acting UC, SSA Nidia Gamba, who reportedly submitted an initial rating of Outstanding for Plaintiff Sercer's 2012 PAR. Subsequently, ASC Kim Tilton directed SSA Gamba and Acting UC Nichols to change the ratings and downgrade SSA Sercer considerably, including in the categories of "Relating with Others and Providing Professional Service" and "Communicating Orally and in Writing". SSA Sercer had been rated Outstanding in her previous PAR in these two areas.

36. While Plaintiff Sercer's final rating for her 2012 PAR was Excellent, she was downgraded to "Fully Successful" ratings in the Critical Elements of "Relating with Others and Providing Professional Service" and "Maintaining High Professional Standards." She subsequently learned from A/UC Nidia Gamba that ASC Tilton, who

SSA Sercer did not know and had never met, had directed that these ratings be "Minimally Successful"; but that UC Nichols and SSA Gamba objected to downgrades of this magnitude.

37. Upon requesting the identity of those who had participated in her PAR ratings, Plaintiff Sercer was told that former UC Slater had directly participated in the rating process of SSA Sercer, and that UC Slater had directed SSA Gamba to document derogatory information to SSA Sercer's drop file, regarding her performance and interactions with others.

38. The 2012 PAR for SSA Sercer included in the section of "Relating with Others and Providing Professional Service," the specific comment that "During the rating period there were seven documented occurrences of unprofessional behavior or commentary as reported by BAU-1 co-workers." Plaintiff Sercer was astounded to see this comment in her PAR, as she was totally unaware of any such complaints or comments.

39. Following several attempts to gain access to her "drop file," which was provided to Plaintiff Sercer only with the presence of a Unit Chief and an FBI supervisor, SSA Sercer was granted access. She was not permitted, however, to copy any documents from the "drop file" folder. Moreover, SSA Sercer was told that she could not share the contents of the drop file with anyone, including the EEO Office, the Office of Professional Responsibility (OPR), or the Office of the Inspector General (OIG). Finally, and suspiciously, before the drop file was shown to SSA Sercer, there were numerous redactions made -- according to UC Nichols and SSA Gamba, the redactions were made by someone unknown to them.

40. What SSA Sercer observed in the drop file were numerous totally false and concocted complaints, largely written by UC Stanley, ASC Rivers, UC Slater and other male colleagues, and which apparently were compiled over a number of months. It was clear to SSA Sercer that discriminatory and retaliatory false documents had been created or solicited by the former Unit Chiefs in order to perpetuate adverse personnel actions against SSA Sercer, as ongoing acts of unlawful discrimination and retaliation. This was done totally without the knowledge of SSA Sercer, and with no ability to challenge or respond to such false and concocted allegations.

41. Subsequent to reviewing her drop file and finding the derivation of many of the adverse PAR comments, on November 16, 2012, SSA Sercer filed a grievance challenging her PAR. SSA Sercer later found out that the grievance process, which resulted in the denial of her PAR grievance on November 26, 2012, was handled by a chain of command which had participated in the various actions against her.

42. Despite the fact that SSA Sercer would have preferred remaining in her chosen position as an FBI Profiler, subsequent to her PAR review SSA Sercer applied for a transfer to the FBI Evidence Response Team Unit (ERTU), through a SAMMS posting. This was done in an effort to seek relief from a hostile work environment and out of wariness of facing continuing discrimination and retaliation, had SSA Sercer stayed in BAU 1 any longer. In November 2012, SSA Sercer was informed that a "voluntary" transfer had been arranged for her to the FBI ERTU, Laboratory Division. SSA Sercer initially protested, stating that she would prefer having earned the transfer through participation in a SAMMS (position selection) Board, as would be the usual process for successfully transferring professional positions, but under these highly unusual

circumstances, and with an acute fear of further retaliation, SSA Sercer accepted the transfer to the ERTU. Such transfer demonstrably harmed SSA Sercer personally and professionally. SSA Sercer was later informed by Laboratory Division Management that she had been ranked Number 1 for the position in ERTU, when they were contacted by CIRG Management regarding the direct transfer.

43. During the period commencing shortly after her assignment to BAU 1, and continuing through her reassignment from her position in November 2012, SSA Sercer also was subjected to an extremely hostile work environment, based upon both her sex (female).

44. Specific acts contributing to the hostile work environment cited herein included derogatory and sexist comments of co-workers, which were tolerated by Unit managers. These included sexually explicit remarks made to SSA Sercer by SSA Jody Kramer. On one occasion, SSA Kramer stated to SSA Carolyn Murphy that he and UC Stanley, while on official deployment, had duped a waitress into exposing her breasts by posing as porn producers who could offer her career opportunities.

45. On another occasion, SSA Sercer went to Louisville, Kentucky, with SSA Kramer on an investigative matter. SSA Kramer was the Team Leader, and had arranged for an on-line date while in Louisville. The night before, SSA Sercer and SSA Kramer were working on their assessment and presentation to the division; and SSA Sercer recommended that they work late to complete their work. SSA Sercer recalls that SSA Kramer told her she could agree to leave early so he could get laid and be in a good mood the following day, or they could work late and SSA Sercer would have to put up with his bad mood.

46. Further, in December 2011, at a Christmas Party, SSA Kramer told SSA Sercer that he was physically attracted to her; a statement which made her very uncomfortable.

47. Another instance contributing to the hostile work environment following her assignment to BAU 1 included the internal and mandatory distribution of a controversial book entitled "*The Game*," which provides "how to" instructions for seducing women through manipulation, which Plaintiff Sercer found demeaning and degrading to women. This book was reportedly recommended and supported by SSA Jody Kramer.

48. On information and belief, SSA Sercer's supervisory chain was aware of and permitted the distribution of the book, and many sexist actions of SSA Kramer and others within the CIRG.

## STATEMENT OF CLAIMS

### COUNT I:

### UNLAWFUL DISCRIMINATION BASED UPON SEX (FEMALE)

49. Paragraphs 1-48 are herein incorporated by reference.

50. The above-described acts reflect discrete and continuing unlawful discrimination based upon sex (female) and the maintenance of a discriminatory and hostile work environment against Plaintiff Sercer by her Federal employer, the FBI, under the Defendant US Department of Justice.

51. As a result of the cited discriminatory treatment, Plaintiff Sercer has suffered permanent loss of personal and professional prestige and recognition; has suffered professional and personal injuries, including mental anguish, from derision and disrespect by her colleagues and superiors; has undergone significant inconvenience and additional

costs associated with her involuntary transfers to undesirable positions; and will be subjected to substantial reduced future earnings both inside and beyond her employment with the Federal Bureau of Investigation.

52. As a result of Defendant's unlawful discriminatory conduct, Plaintiff Sercer demands the relief set forth below:

    a. Payment of an amount not less than $1,000,000 for monetary compensation for loss of income and loss of future income, plus appropriate interest on past lost income;

    b. Compensatory damages in an amount of at least $300,000;

    c. Immediate transfer to a position of her choosing within the FBI, at a location of her choosing;

    d. Removal of all negative or adverse references to Plaintiff's character, conduct, or performance of duties from all personnel, disciplinary, and other records and documents maintained by the Defendant;

    e. Payment of all reasonable attorney's fees and costs associated with this litigation and all administrative proceedings which occurred prior to the initiation of this litigation; and,

    f. Such other relief as this Honorable Court may direct.

### COUNT II:

### UNLAWFUL RETALIATION FOR PRIOR PROTECTED EEO ACTIVITIES

53. Paragraphs 1-52 are herein incorporated by reference.

54. The above-described acts reflect discrete and continuing unlawful retaliation against Plaintiff Sercer based upon Plaintiff's prior protected activities of complaining of

adverse treatment based on sex, and the maintenance of a hostile work environment, conducted by senior officials and employees of Plaintiff Sercer by her Federal employer, the FBI, under the Defendant US Department of Justice.

    55. As a result of the cited hostile work environment and retaliatory treatment based on her prior protected EEO activities, Plaintiff Sercer has suffered permanent loss of personal and professional prestige and recognition; has suffered professional and personal injuries, including mental anguish, from derision and disrespect by her colleagues and superiors; has undergone significant inconvenience and additional costs associated with her involuntary transfers to undesirable positions; and will be subjected to substantial reduced future earnings both inside and beyond her employment with the Federal Bureau of Investigation.

    56. As a result of Defendant's unlawful retaliatory and hostile conduct, Plaintiff Sercer demands the relief set forth below:

    a. Payment of an amount not less than $1,000,000 for monetary compensation for loss of income and loss of future income, plus appropriate interest on past lost income;

    b. Compensatory damages in an amount of at least $300,000;

    c. Immediate transfer to a position of her choosing within the FBI, at a location of her choosing;

    d. Removal of all negative or adverse references to Plaintiff's character, conduct or performance of duties from all personnel, disciplinary, and other records and documents maintained by the Defendant;

e. Payment of all reasonable attorney's fees and costs associated with this litigation and all administrative proceedings which occurred prior to the initiation of this litigation; and,

f. Such other relief as this Honorable Court may direct.

## DEMAND FOR TRIAL BY JURY

Plaintiff Sercer respectfully demands a Trial by Jury on all aspects of her Complaint and claims.

Respectfully submitted,

_____
MICHAEL W. BEASLEY, ESQ.
Virginia State Bar No. 30872
Attorney for Plaintiff Angela M. Sercer
Law Offices of Michael W. Beasley
200 Park Avenue, Suite 106
Falls Church, VA 22046
Phone: (703) 533-5875; Cell Phone (703) 994-2524
Fax: (703) 533-5876; E-Mail: mwbeasley@verizon.net

June  6 , 2014