UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(ALEXANDRIA DIVISION)

|  |  |
|---|---|
| **ANGELA M. SERCER,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) **Civil Action No. 1:14-cv-00681** |
|  | ) **(CMH/JFA)** |
| **ERIC H. HOLDER, in His Official Capacity as** | ) |
| **Attorney General of the United States,** | ) |
|  | ) |
| **Defendant.** | ) |

## AMENDED COMPLAINT OF ANGELA M. SERCER

(UNLAWFUL DISCRIMINATION BASED UPON SEX AND
UNLAWFUL RETALIATION FOR PRIOR PROTECTED ACTIVITIES
IN FEDERAL EMPLOYMENT)

COMES NOW the Plaintiff (consolidated) in this proceeding, Angela M. Sercer,

appearing by and through counsel and pursuant to authority of the Court's Order filed

September 5, 2014 (Docket #19), and alleges as follows:

### JURISDICTION

1. Jurisdiction in this matter is based upon Title VII of the Civil Rights Act of

1964, as amended, codified at 42 U.S.C.A. Section 2000(e), *et seq.,* in that Plaintiff

Sercer was unlawfully discriminated against based upon her sex (female) by her Federal

Government employer, the Federal Bureau of Investigation (FBI), a subordinate Agency

of the United States Department of Justice (DOJ); and subsequently was subjected to

unlawful retaliation for her prior protected Equal Employment Opportunity activities, all

while employed by the United States Government.

1

## VENUE

2.  Venue in this matter properly lies with the United States District Court for the Eastern District of Virginia, Alexandria Division, insofar as Defendant employs Plaintiff Sercer in the area of Northern Virginia, within the Commonwealth of Virginia; the majority of alleged discriminatory and retaliatory acts of Defendant against Plaintiff Sercer took place within this venue; and, on information and belief, numerous records concerning Plaintiff's employment are substantially maintained in this venue.  28 U.S.C. Section 1391 and 42 U.S.C. Section 2000e5(f).

## PARTIES

3.  Plaintiff Angela M. Sercer is a female Supervisory Special Agent (SSA) employed by the Federal Bureau of Investigation (FBI), an Agency within the United States Department of Justice (DOJ).  Ms. Sercer resides in Stafford, Virginia.

4.  Defendant Eric A. Holder is the Attorney General of the United States and serves as the Head of the United States Department of Justice, which governs for all purposes the Federal Bureau of Investigation, and is sued in his official capacity only.

5.  As part of his official duties, Mr. Holder is responsible for the actions of DOJ and its subordinate Agency, the FBI.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.  Subsequent to certain of the actions set forth herein, SSA Sercer initated EEO counseling on November 5, 2012.  Because the informal counseling process failed to remedy her various EEO complaints, SSA Sercer filed a complaint of unlawful discrimination and retaliation for prior protected EEO activity with the FBI's Office of Equal Employment Opportunity Affairs (OEEOA) on March 4, 2013.  This complaint

was docketed as FBI-2013-00121.  By letters dated June 7, 2013, and August 14, 2013, the FBI OEEOA advised SSA Sercer that the following allegations had been accepted for investigation:

"Whether [SSA Sercer] was  discriminated against and harassed based on sex (female) and reprisal when from June 2010, through November 26, 2012:

"1) Sexually explicit comments were made to her and derogatory comments were made regarding her behavior and work performance;

"2) She was not informed of or included in meetings regarding projects;

"3) She discovered that her personal drop folder contained negative and false comments;

"4) On October 25, 2012, she received an "Excellent" rating on her 2012 Performance Appraisal Report (PAR), with "Fully Successful" ratings in the Critical Elements of "Relating with Others and Providing Professional Service" and "Maintaining High Professional Standards";

"5)  Her subsequent PAR grievance was denied; and

"6) She was transferred to another unit.  Ex. 9." [Citation in original.]

7.  The FBI Office of Equal Employment Opportunity inserted the terminology into the Plaintiff's EEO Complaint regarding the alleged "hostile work environment," and explained that the specific allegations cited therein were for illustrative purposes and might not be and need not be "all-inclusive" of the individual acts and actions that constituted or contributed to the hostile work environment.  Specific additional incidents and actions were further presented in the Plaintiff's Sworn Statement and interview

comments in furtherance of the EEO Complaint, but the wording of the Complaint allegations was not further modified by the FBI's OEEOA.

8.  On February 19, 2014, the FBI Report of Investigation (ROI) regarding SSA Sercer's EEO complaints was forwarded to Plaintiff Sercer and her legal counsel.

9.  On February 25, 2014, SSA Sercer elected to not have her case referred to an Administrative Judge of the Equal Employment Opportunity Commission (EEOC), and demanded that the ROI be forwarded to the US Department of Justice for issuance of a Final Agency Decision (FAD).  On information and belief, the FBI OEEOA then forwarded the initial ROI to the Department of Justice for issuance of the FAD.

10.  By letter dated May 9, 2014, the FBI OEEOA notified SSA Sercer and her counsel that an attachment to the initial ROI had been inadvertently omitted from the service copy of the ROI provided to SSA Sercer and her counsel.  A copy of the Amended ROI was again provided to SSA Sercer and her counsel at that time, with information provided that the Amended ROI also was being provided to DOJ for issuance of the FAD.

11.  By letter dated May 23, 2014, The Complaint Adjudication Office of DOJ advised SSA Sercer and her counsel that the ROI had been received and that a "Final Decision on your complaint will be rendered as soon as possible."

12.  Pursuant to EEO Regulations, the Department of Justice has 60 days to timely render its FAD subsequent to receipt of the Claimant's file from the FBI.  As of this date, over 90 days have passed since the forwarding of Plaintiff's ROI to DOJ for the issuance of the FAD, although the date of DOJ receiving the Amended ROI cannot be determined.

13.  This case is timely filed with the United States District Court since over sixty (60) days have passed without the issuance of the FAD by DOJ and without receipt of the FAD by Plaintiff Sercer.  Moreover, more than 180 days have passed since the filing of Plaintiff's formal EEO Complaint, without final action having been taken by the Defendant, thus resulting in the right to bring this matter to the United States District Court.

## FACTUAL ALLEGATIONS; BACKGROUND

14.  Paragraphs 1 through 13 are herein incorporated by reference.

15.  Plaintiff Sercer entered employment with the FBI on March 10, 2002.  At the time of her employment, Plaintiff Sercer had a significant level of education and employment experience.  This includes undergraduate and graduate degrees in Criminal Justice, and previous work experience as a Special Agent with the Bureau of Alcohol, Tobacco, and Firearms, where she conducted firearms, arson and explosives investigations.  SSA Sercer's work experience also includes employment as an Adult Probation Officer, and a Social Worker working with delinquent children and investigating child abuse and neglect.  Upon entering the FBI, SSA Sercer was assigned to the Washington Field Office where she investigated domestic and international terrorism matters as well as criminal matters.  She was also a member of the Evidence Response Team.  She also obtained substantial and significant experience in domestic and international terrorism, including numerous overseas deployments to the Middle East, and conducted investigations in support of United States wars in Afghanistan and Iraq.

16.   Based upon her superior education and experience, in March 2010, Plaintiff Sercer was promoted to Supervisory Special Agent (SSA) and assigned to the FBI's Behavioral Analysis Unit (BAU) I, Investigative Operations Support Section (IOSS), Critical Incident Response Group (CIRG).

17.   Four BAUs provide operational support to FBI field offices and other law enforcement entities in the investigation of complex and time-sensitive crimes, typically involving acts or threats of violence.

18.   Unlike many other assignments within the FBI, where training and experience are often obtained after being assigned a given area of focus, NCAVC positions require the possession of extensive pertinent knowledge prior to assignment there.  The description of the NCAVC on the fbi.gov website states that it provides "expertise."  Behavioral assessment is not a routine job function among field agents or supervisors, but is a professional job specialty.  It is recognized and touted by the FBI as a unique, expert position and, thus, is not the same as other GS-14 FBI supervisor positions.

19.   This fact is further recognized by the FBI as SSA positions in the NCAVC are exempt from the term limit policy which restricts special agent supervisors to a seven-year term of service in a particular position.

20.   Additionally, and in furtherance of the performance of their duties, NCAVC SSAs serve as consultants for federal, state, and local law enforcement throughout the United States, and also regularly lend their expertise to international law enforcement agencies.  Expertise within a given area of focus is mandatory in order to responsibly provide the level of guidance requested, expected, and needed by the NCAVC clientele.

Although extensive training is provided to SSAs when first assigned to the NCAVC, their accumulated professional knowledge is the basis for what will be developed into specific subject matter expertise.  This expertise, in turn, forms the basis for guidance provided to the field regarding some of the most sensitive law enforcement matters in the world.

21.  Following her assignment to BAU I, SSA Sercer attended three months of Phase I classroom training, and several additional months of Phase II on-the-job training. Upon successful completion of Phase II training, SSA Sercer was awarded certification in Behavioral Analysis.

22.  Within BAU I, SSA Sercer was assigned to provide support to investigations involving Domestic Terrorism (DT) matters.  Because of her background and training, SSA Sercer was assigned to be the DT Program Manager.  Because of her solid experience in International Terrorism (IT), SSA Sercer also was consistently assigned IT cases throughout her tenure at BAU I.  Of importance, SSA Sercer was assigned as the Lone Offender (LO) Research Project Manager, largely because of the link between LOs and Domestic Terrorism.  An LO is associated with an act conceived or executed by one or a few individuals, not operating under the direction or influence of an organized group. While the subject may reach out to others for assistance, the LO is the primary architect of the operation, and his/her effort is self-generated rather than directed by others.  The focus is on a subject who consciously accepts the use of lethal violence in furtherance of an ideological, political, social, or religious cause; and the act may result in homicide, or likely would have, had unforeseen circumstances not occurred.

23.  SSA Sercer had actively sought her assignment to BAU I, and considered it to be a critical step to achieve her FBI career goals.  Based upon her education,

experience and exceptional past duty performance, SSA Sercer was ideally suited for the Behavioral Analysis and Profiler positions -- and considered her assignment to be the culmination of a lifelong ambition.  During her tenure with the BAU-1, her colleagues and recipients of her assessments uniformly considered SSA Sercer's work excellent.

24.  During the period commencing shortly after her assignment to BAU 1, and continuing through her reassignment from her position in November 2012, SSA Sercer also was subjected to an extremely hostile work environment, based upon her sex (female).

25.  Specific acts contributing to the hostile work environment cited herein included derogatory and sexist comments of co-workers, which were tolerated by Unit managers.  These included sexually explicit remarks made to SSA Sercer by SSA Jody Kramer.  On one occasion, SSA Kramer stated to SSA Carolyn Murphy that he and UC Stanley, while on official deployment, had duped a waitress into exposing her breasts by posing as porn producers who could offer her career opportunities.

26.  On another occasion, SSA Sercer went to Louisville, Kentucky, with SSA Kramer on an investigative matter.  SSA Kramer was the Team Leader, and had arranged for an on-line date while in Louisville.  The night before, SSA Sercer and SSA Kramer were working on their assessment and presentation to the division; and SSA Sercer recommended that they work late to complete their work.  SSA Sercer recalls that SSA Kramer told her she could agree to leave early so he could get laid and be in a good mood the following day, or they could work late and SSA Sercer would have to put up with his bad mood.

27.  Further, in December 2011, at a Christmas Party, SSA Kramer told SSA Sercer that he was physically attracted to her; a statement which made her very uncomfortable.

28.  Another instance contributing to the hostile work environment following her assignment to BAU 1 included the internal and mandatory distribution of a controversial book entitled "*The Game,*" which provides "how to" instructions for seducing women through manipulation, which Plaintiff Sercer found demeaning and degrading to women. This book was reportedly recommended and supported by SSA Jody Kramer.

29.  On information and belief, Plaintiff Sercer's supervisory chain was aware of and permitted the distribution of the book, and many sexist actions of SSA Kramer and others within the CIRG.

30.  While Plaintiff Sercer was offended by these various actions, she was extremely committed to her work and did not desire to cause any problems for her supervisory chain-of-command.  This, combined with a fear of probable retaliation, caused her to not report any of these incidents as acts of discrimination within the formal EEO process.

31  Soon after SSA Sercer was assigned to BAU I, Scott Stanley was appointed as Unit Chief (UC), in which position he served as SSA Sercer's immediate supervisor.

32.  Shortly after UC Stanley's arrival in BAU I, Plaintiff Sercer began to notice a bias against female Special Agents, and preferences given to male Special Agents, within BAU I by UC Stanley.  While many of the matters of which SSA Sercer became aware may seem unrelated to each other, Plaintiff Sercer eventually realized that these individual actions created a pervasive pattern of misconduct, discrimination, favoritism,

nepotism and retaliation for protected activities within NCAVC.  UC Stanley contributed significantly to this perverse environment.

33.  In March 2011, apparently due to budget cuts, NCAVC employees were losing a large portion of FBI take-home vehicles.  UC Stanley decided the remaining vehicles would be assigned based on distance from the office, which would allow for SSA Sercer and another female SSA within the Unit to have a take-home vehicle.  UC Stanley approached each female separately and discouraged them from taking the vehicle, asking them instead to allow a male colleague and personal friend of UC Stanley to utilize the Government vehicle.

34.  In a subsequent Unit meeting, SSA Sercer suggested a more equitable arrangement such as a rotation, so that all Unit members would have an equal opportunity to use the vehicle.  UC Stanley again discouraged SSA Sercer from claiming the vehicle, in front of the unit.  UC Stanley purposefully gave Unit members the perception that the male colleague would have to purchase an additional vehicle for his stay-at-home wife, which would be a significant financial strain, if SSA Sercer did not agree to forfeit the vehicle to him.  SSA Sercer and the other female SSA eventually forfeited the vehicle to the male SSA, but later learned that he was not experiencing financial issues, and in fact bragged that he had made several real estate purchases, and his wife was starting a catering business.

35.  Plaintiff Sercer ultimately consulted with the Assistant Division Counsel, who stated that the distribution of the vehicles based on distance to home was against FBI policy, and that a more equal arrangement would have to be made.  UC Stanley's attitude towards SSA Sercer appeared to change in a negative manner subsequent to this event.

36.  Plaintiff Sercer was specifically precluded by UC Stanley from moving forward with her assigned LO Research Project, while male special agents within BAU I were participating in meetings and deployment activities related to LOs.  SSA Sercer was deliberately excluded by UC Stanley from such participation.

37.  Plaintiff Sercer complained a number of times regarding the failure of UC Stanley to support her Lone Offender Research Project.  Her basis of complaint was that UC Stanley stated that Plaintiff could not be funded because of budget and staffing issues, but this occurred while UC Stanley was allowing male colleagues of Plaintiff to further the project through their participation in key meetings, training events, overseas liaison activities and workshops overseas, without the knowledge of Plaintiff Sercer.

38.  Not allowing Plaintiff Sercer to participate in event, training, and cases related to Lone Offenders crippled her ability to advance her knowledge in this area, and eliminated her ability to maintain credibility as the Lone Offender SME and research coordinator.

39.  Not allowing SSA Sercer to work the LO project also affects her ability to further her educational credentials by becoming published in her area of expertise.  This ultimately affected her post-FBI opportunities for employment.  Lone Offenders are a major concern, as evidenced by such tragedies as the Boston bombings, and there is little reputable research in this area.  It is uncharted territory, which many, including SSA Sercer's male colleagues, wanted to take credit for.

40.  Further, during an October 13, 2011, Unit meeting with ASC Rivers and Acting Unit Chief Simons, ASC Rivers stated that BAU-1 would be proceeding with the Radicalization Project through NCTC, and the LO research project was no longer being

pursued.  ASC Rivers, a close personal friend of UC Stanley, also stated that four male

SSAs were going to London to discuss BAU-1 assistance for the Olympics, and to

provide presentations to address IT and Threat matters only.  ASC Rivers further

explained that the four males were being considered for TDY assignments to London

during the 2012 Summer Olympics.  Despite the fact that this event had been documented

as a Lone offender workshop, ASC Rivers emphatically denied that it was LO related.

He stated that the deployment and TDYs were not related to LOs and that there had been

no request for assistance with LOs.  This explanation was not credible, as ASC Rivers'

determinations were made for the purpose of excluding SSA Sercer from the project

assistance.  Despite Plaintiff Sercer's protests, ASC Rivers refused to take any actions to

correct the situation.  Moreover, upon the return of the assigned SSAs from the London

Olympics, they admitted that that the British were looking for threat assessments, lone

offenders, and IT lone offenders and groups.  These requirements met the precise

qualifications of Plaintiff Sercer, underscoring the contrived efforts to purposefully

exclude her from participation.

41.  UC Stanley also refused to consider Plaintiff Sercer for Outstanding ratings

for the 2011 rating year, stating that she could not be expected to receive Outstanding

ratings, as they were "reserved" for people who would receive Qualitative Step Increases

(QSIs).  UC Stanley steadfastly refused to inform SSA Sercer of the actions she would

have to take to merit Outstanding (the highest) performance ratings.  On information and

belief, however, Outstanding ratings and QSIs were frequently awarded to male SSAs

within BAU Unit I by UC Stanley, while SSA Sercer could only receive Excellent

ratings.

42.  As a result of the observation of bias by UC Stanley and other females within BAU I, three female Special Agents and one male Special Agent in BAU I, including Plaintiff Sercer, met with two BAU I male colleagues to address their perceptions and observations of UC Stanley's conduct.  During this meeting SSA Sercer expressed her observations that she was being thwarted by UC Stanley in her role as LO Project Manager; including being excluded from cases and meetings dealing directly with her area of professional responsibility.  Further, several  females, including Plaintiff Sercer, objected strenuously to favoritism and bias on behalf of two male SSAs within the Unit who apparently had received favorable assignments and travel, as well as other favorable treatment from UC Stanley.

43.  In a subsequent meeting with UC Stanley held in early February 2012, Plaintiff Sercer was told by UC Stanley that because of her comments at the meeting, SSA Sercer had been identified by other BAU I SSAs as the cause of the majority of "issues" or problems in the unit.  UC Stanley pointedly stated that, particularly, the two male SSAs were "very pissed" at her, and had taken her comments "personally." Plaintiff Sercer protested that this had been an open meeting to express observations and had received the full participation of all Unit SSAs.  UC Stanley again reiterated that Plaintiff Sercer apparently was the cause of the problem, not the relevant male SSAs.

44.  In February 2012, following additional instances of discriminatory and retaliatory treatment against her by UC Stanley, Plaintiff Sercer requested and received a meeting with CIRG Section Chief Juan Molina.  At this meeting, SSA Sercer identified the biased and discriminatory treatment she was receiving from UC Stanley, particularly regarding her management of the Unit DT and LO Programs.  While SC Molina advised

SSA Sercer that he would look into the situation and get back to her, he never responded to Plaintiff Sercer regarding her concerns.

45.   Unknown to Plaintiff Sercer, ASC Rivers and UC Stanley had met with SC Molina prior to the cited meeting.  Immediately thereafter, ASC Rivers and UC Stanley started documenting false information about the duty performance of SSA Sercer, including fabricated comments about SSA Sercer's emotional state.  Such documents were placed in a personnel "drop folder" which was maintained by UC Stanley and kept secret from SSA Sercer.

46.   Subsequently in 2012, SSA Kimberly Quesinberry of the Crimes Against Adults (CAA) BAU Unit, learned that three female NCAVC employees had received Employee Assistance Program (EAP) referrals, all made by the same male UC, now believed to be UC Stanley.  These referrals were allegedly made by CIRG management for purported emotional problems suffered by the women.  In the fall of 2012, a fourth female employee, Plaintiff Sercer, told SSA Quesinberry that CIRG managers and UC Stanley were  trying to have her referred to EAP for "emotional issues."  Upon communicating this information, SSA Quesinberry informed SSA Sercer of the several other NVAVC referrals of women to EAP counselling.  At that point, Plaintiff Sercer described to SSA Quesinberry the efforts of her Unit Chief to fabricate charges of mental instability in order to refer her to EAP counseling.

47.   In the case of SSA Sercer, CIRG managers had falsified information about her in an attempt to justify their actions.  On information and belief, no male employees were treated in the same way at the NCAVC.

41.   On March 13, 2012, ASC Rivers and UC Stanley attempted to force Plaintiff

Sercer to alter the content of an official FBI document.  SSA Sercer appealed to SC

Molina, stating that the circumstances in Unit 1 had become untenable and had interfered

with important operational matters.  SSA Sercer also revealed that she had made contact

with an EEO representative to seek relief from the situation within the Unit of ongoing

bias and discrimination based upon her sex; and that she would appreciate the

opportunity to discuss these various issues with ASC Rivers.  SSA Sercer's written

communications with SC Molina regarding her contact with the EEO Counselor, dated

March 13, 2012, are matters of record, as are her complaints regarding the apparently

biased and discriminatory actions against Plaintiff by UC Stanley and ASC Rivers.

48.  Following the revelation to SC Molina that she had had communications with

an EEO Counselor, Plaintiff Sercer began to suffer from further acts of discrimination,

and apparent retaliation for her EEO actions.

49.  At an impromptu meeting called by SC Molina on March 14, 2012, SC

Molina met with SSA Sercer, but with ASC Rivers also attending the meeting.  At that

time, SC Molina stated that he was not going to address the concerns of SSA Sercer, and

that he was angry that SSA Sercer had refused to change the referenced document when

directed to do so.  Despite SSA Sercer's explanation as to the illegality of what she had

been told to do, SC Molina stated that it was apparent that SSA Sercer was not willing to

follow orders; that she had to do what management said to do without question; and if she

did not do it, she would face charges of insubordination.

50.  Following the threats of SA Molina and ASC Rivers, SSA Sercer changed the

document -- but reported the misconduct to the CIRG Ethics Coordinator and Chief

Division Counsel (CDC), Ken Gross.  Counsel Gross agreed that what SSA Sercer had

been directed to do was against FBI policy and inappropriate, and stated that he would report the misconduct to his chain of command.  Subsequently, on March 30, 2012, CIRG personnel received notification that ASC Rivers and UC Stanley were abruptly being transferred -- with UC Stanley stepping down to a GS-13 assignment, and ASC Rivers being laterally transferred to the CIRG Aviation Unit.  SSA Sercer was never informed whether these actions were related to her conversation with Counsel Gross about the inappropriate documentation actions which she had been directed to take over her objections.

51.   Subsequently, UC Slater was appointed to be the Acting/ASC.  Subsequently, in approximately August 2012, UC Slater was appointed to be the new BAU I Unit Chief. UC Slater has been the individual named in numerous other complaints of unlawful discrimination against female special agents, and accused of instances of unlawful retaliation against certain FBI Senior Special Agents for prior protected EEO conduct. UC Slater continued the pattern of discrimination and retaliation against Plaintiff Sercer upon his assumption of UC duties within BAU 1.

52.   UC Slater refused to permit SSA Sercer to perform any of her LO duties, and told one of her male colleagues that he was displeased with SSA Sercer, and that she had a "long history of problems and confrontations."  On information and belief, these allegations were false and concocted in furtherance of unlawful discrimination and retaliation against SSA Sercer.

53.   Plaintiff Sercer requested a meeting with UC Slater which took place on September 7, 2012, to discuss her ongoing concerns regarding her LO duties and other adverse actions being taken against her; as well as general Unit organizational issues.  At

that meeting, UC Slater stated that he needed additional time to consider SSA Sercer's various recommendations.  At no time during this meeting did UC Slater express concerns about SSA Sercer's performance or interactions with others.

54.  Six days later, on September 13, 2012, a reorganization of certain selected elements of the NCAVC was announced.  Plaintiff Sercer's Lone Offender assignment was rescinded, and transferred to another CIRG Unit -- the same Unit to be occupied by UC Slater following the reorganization.  SSA Sercer believed the transfer of her LO assignment to be a direct result of discrimination and retaliation for her prior EEO activities.

55.  UC Mark Nichols was named the new Unit Chief of BAU Unit I following the "reorganization."  In this position for less than three weeks, UC Nichols became responsible for preparing the annual PAR for SSA Sercer for the period ending September 30, 2012.

56.  The resulting PAR was drafted by the prior Acting UC, SSA Nidia Gamba, who reportedly submitted an initial rating of Outstanding for Plaintiff Sercer's 2012 PAR.  Subsequently, ASC Kim Tilton directed SSA Gamba and Acting UC Nichols to change the ratings and downgrade SSA Sercer considerably, including in the categories of "Relating with Others and Providing Professional Service" and "Communicating Orally and in Writing".  SSA Sercer had been rated Outstanding in her previous PAR in these two areas.

57.  While Plaintiff Sercer's final rating for her 2012 PAR was Excellent, she was downgraded to "Fully Successful" ratings in the Critical Elements of "Relating with Others and Providing Professional Service" and "Maintaining High Professional

17

Standards."  She subsequently learned from A/UC Nidia Gamba that ASC Tilton, who SSA Sercer did not know and had never met, had directed that these ratings be "Minimally Successful"; but that UC Nichols and SSA Gamba objected to downgrades of this magnitude.

58.  Upon requesting the identity of those who had participated in her PAR ratings, Plaintiff Sercer was told that former UC Slater had directly participated in the rating process of SSA Sercer, and that UC Slater had directed SSA Gamba to document derogatory information to SSA Sercer's drop file, regarding her performance and interactions with others.

59.  The 2012 PAR for SSA Sercer included in the section of "Relating with Others and Providing Professional Service," the specific comment that "During the rating period there were seven documented occurrences of unprofessional behavior or commentary as reported by BAU-1 co-workers."  Plaintiff Sercer was astounded to see this comment in her PAR, as she was totally unaware of any such complaints or comments.

60.  Following several attempts to gain access to her "drop file," which was provided to Plaintiff Sercer only with the presence of a Unit Chief and an FBI supervisor, SSA Sercer was granted access.  She was not permitted, however, to copy any documents from the "drop file" folder.  Moreover, SSA Sercer was told that she could not share the contents of the drop file with anyone, including the EEO Office, the Office of Professional Responsibility (OPR), or the Office of the Inspector General (OIG).  Finally, and suspiciously, before the drop file was shown to SSA Sercer, there were numerous

redactions made -- according to UC Nichols and SSA Gamba, the redactions were made by someone unknown to them.

61.   What SSA Sercer observed in the drop file were numerous totally false and concocted complaints, largely written by UC Stanley, ASC Rivers, UC Slater and other male colleagues, and which apparently were compiled over a number of months.  It was clear to SSA Sercer that discriminatory and retaliatory false documents had been created or solicited by the former Unit Chiefs in order to perpetuate adverse personnel actions against SSA Sercer, as ongoing acts of unlawful discrimination and retaliation.  This was done totally without the knowledge of SSA Sercer, and with no ability to challenge or respond to such false and concocted allegations.

62.   Subsequent to reviewing her drop file and finding the derivation of many of the adverse PAR comments, on November 16, 2012, SSA Sercer filed a grievance challenging her PAR.  SSA Sercer later found out that the grievance process, which resulted in the denial of her PAR grievance on November 26, 2012, was handled by a chain of command which had participated in the various actions against her.

63.   Upon further inquiry, SSA Gamba admitted that much of the negative feedback included in the drop file and the PAR came from SSA Jody Kramer, a male agent who had a personal motivation for making false claims against SSA Sercer.  SSA Kramer had, for example, falsely asserted that one of SSA Sercer's conference presentations was insulting, and resulted in people getting up and walking out.  SSA Gamba admitted that SSA Kramer was the sole source of this adverse comment, and that she made no effort to verify the contrived comments by contacting the NCAVC conference coordinator, the New York  coordinator, contacting any other attendees, or by

reading the reviews.  SSA Gamba stated that she did not have access to the reviews, however, SSA Sercer alerted her to the fact that she and UC Slater had both initialed the routing document, indicating that they had received and reviewed the presentation reviews, which were all positive.

64.  SSA Sercer was not made aware of or counseled on any of the alleged complaints in her drop file, at any time, until she was informed of them during her PAR review on October 25, 2012.  SSA Sercer simply never had an opportunity to refute these various complaints.  Rather than having an ability to challenge and disprove the adverse comments, FBI management solicited, collected, and saved them for inclusion in her downgraded PAR ratings and, eventually, her Loss of Effectiveness finding, as continuing acts of discrimination and retaliation for lodging her EEO complaints.

65.  Despite the fact that SSA Sercer would have preferred remaining in her chosen position as an FBI Profiler, subsequent to her PAR review SSA Sercer applied for a transfer to the FBI Evidence Response Team Unit (ERTU), through a SAMMS posting. This was done in an effort to seek relief from a hostile work environment and out of wariness of facing continuing discrimination and retaliation, had SSA Sercer stayed in BAU 1 any longer.  In November 2012, SSA Sercer was informed that a "voluntary" transfer had been arranged for her to the FBI ERTU, Laboratory Division.

66.  SSA Sercer initially protested, stating that she would prefer having earned the transfer through participation in a SAMMS (position selection) Board, as would be the usual process for successfully transferring professional positions, but under these highly unusual circumstances, and with an acute fear of further retaliation, SSA Sercer accepted the transfer to the ERTU.   Such transfer demonstrably harmed SSA Sercer personally

and professionally.  SSA Sercer was later informed by Laboratory Division Management that she had been ranked Number 1 for the position in ERTU, when they were contacted by CIRG Management regarding the direct transfer.

67.  Additionally, while CIRG claims that this was a voluntary transfer, with no negative impact and, therefore, not retaliatory, SSA Sercer subsequently received a "retroactive" Loss of Effectiveness finding several months later, without her knowledge.

68.  Specifically, Plaintiff Sercer had transferred out of the Division in December, 2012.  A Special Inspection of CIRG took place in April 2013, and SSA Sercer was called back from her position in the Laboratory Division for a personal interview.  Just following this inspection, specifically on May 1, 2013, is when four other EEO complainants received verbal notification that they had received LOEs and involuntary transfers.  It subsequently was alleged that these other four complainants had engaged in almost identical conduct as SSA Sercer in complaining of systemic discrimination and retaliation within a BAU Unit, often involving exactly the same individuals who had committed similar acts against Plaintiff Sercer.

69.  The conduct of the Special Inspection was attributed by senior FBI officials to the actions of these four complainants, and SSA Sercer subsequently was subjected to the same adverse treatment as were they.  This included the administration of a highly suspect and negative Loss of Effectiveness finding.

70.  Plaintiff Sercer had no idea she was included in the administration of an LOE, and she was never contacted about it.  The only way that Plaintiff Sercer discovered this action was because, in approximately September 2013, one of the female SSA complainants was pressing AD McNamara for the LOE documentation, and AD

McNamara told her there were "five" LOE recipients.  SSA Sercer searched her name in the FBI database, and found what she believed to be the document related to her LOE, which was blocked out in its entirety.

71.  Plaintiff Sercer spent several months pursuing different avenues trying to confirm whether there was an LOE against her, before she finally garnered the negative attention of AD McNamara.  AD McNamara contacted SSA Sercer's then DAD, now AD, and had him reprimand her for searching her name in the FBI database.

72.  SSA Sercer's AD did confirm for her, however, that there was an LOE in her personnel file, as told to him through an e-mail with AD McNamara.

73.  In late April 2014, SSA Sercer finally received confirmation from the FBI Ombudsman's office that she did receive an LOE which had been issued in April 2013. They considered it a "retroactive" LOE, indicating that if SSA Sercer had not already transferred out of the division several months before the inspection, she would have suffered a LOE transfer.

74.  On May 4, 2014, SSA Sercer contacted the FBI OEEOA and she filed a formal EEO complaint regarding this matter in early June 2014.

75.  Plaintiff Sercer still has not received appropriate confirmation, documentation, or reasoning behind the LOE, which clearly was a serious and late-discovered effort of the FBI to discredit and punish her for her prior protected EEO activities.

76.  The administration of such LOEs has been subject to intensive investigation and review by the DOJ OIG and U.S. Senate officials, insofar as the issuance of an LOE constitutes a secretive and highly adverse FBI personnel action that frequently is

accomplished without sufficient review or recourse by the accused.  That certainly was the case with Plaintiff Sercer, who discovered the existence of her LOE approximately one year after it was initiated and placed into her personnel file.

77.  As a result of the cited discriminatory and retaliatory treatment, Plaintiff Sercer has suffered permanent loss of personal and professional prestige and recognition; has suffered professional and personal injuries, including mental anguish, from derision and disrespect by her colleagues and superiors; has undergone significant inconvenience and additional costs associated with her involuntary transfers to undesirable positions; and will be subjected to substantial reduced future earnings both inside and beyond her employment with the Federal Bureau of Investigation.

**STATEMENT OF CLAIMS**

**COUNT I:**

**UNLAWFUL DISCRIMINATION BASED UPON SEX (FEMALE)**

78.  Paragraphs 1-77 are herein incorporated by reference.

79.  The above-described acts reflect discrete and continuing unlawful discrimination based upon sex (female) and the maintenance of a discriminatory and hostile work environment against Plaintiff Sercer by her Federal employer, the FBI, under the Defendant US Department of Justice.

80.  As a result of the cited discriminatory treatment, Plaintiff Sercer has suffered permanent loss of personal and professional prestige and recognition; has suffered professional and personal injuries, including mental anguish, from derision and disrespect by her colleagues and superiors; has undergone significant inconvenience and additional costs associated with her involuntary transfers to undesirable positions; and will be

subjected to substantial reduced future earnings both inside and beyond her employment with the Federal Bureau of Investigation.

81.  As a result of Defendant's unlawful discriminatory conduct, Plaintiff Sercer demands the relief set forth below:

a. Payment of an amount not less than $1,000,000 for monetary compensation for loss of income and loss of future income, plus appropriate interest on past lost income;

b.  Compensatory damages in an amount of at least $300,000;

c.  Immediate transfer to a position of her choosing within the FBI, at a location of her choosing;

d.  Removal of all negative or adverse references to Plaintiff's character, conduct, or performance of duties from all personnel, disciplinary, and other records and documents maintained by the Defendant;

e.  Payment of all reasonable attorney's fees and costs associated with this litigation and all administrative proceedings which occurred prior to the initiation of this litigation; and,

f.  Such other relief as this Honorable Court may direct.

## COUNT II:

### UNLAWFUL RETALIATION FOR
### PRIOR PROTECTED EEO ACTIVITIES

82.  Paragraphs 1-81 are herein incorporated by reference.

83.  The above-described acts reflect discrete and continuing unlawful retaliation against Plaintiff Sercer based upon Plaintiff's prior protected activities of complaining of adverse treatment based on sex, and the maintenance of a hostile work environment,

conducted by senior officials and employees of Plaintiff Sercer by her Federal employer, the FBI, under the Defendant US Department of Justice.

84.   As a result of the cited hostile work environment and retaliatory treatment based on her prior protected EEO activities, Plaintiff Sercer has suffered permanent loss of personal and professional prestige and recognition; has suffered professional and personal injuries, including mental anguish, from derision and disrespect by her colleagues and superiors; has undergone significant inconvenience and additional costs associated with her involuntary transfers to undesirable positions; and will be subjected to substantial reduced future earnings both inside and beyond her employment with the Federal Bureau of Investigation.

85.   As a result of Defendant's unlawful retaliatory and hostile conduct, Plaintiff Sercer demands the relief set forth below:

a.   Payment of an amount not less than $1,000,000 for monetary compensation for loss of income and loss of future income, plus appropriate interest on past lost income;

b.   Compensatory damages in an amount of at least $300,000;

c.   Immediate transfer to a position of her choosing within the FBI, at a location of her choosing;

d.   Removal of all negative or adverse references to Plaintiff's character, conduct or performance of duties from all personnel, disciplinary, and other records and documents maintained by the Defendant;

e.  Payment of all reasonable attorney's fees and costs associated with this litigation and all administrative proceedings which occurred prior to the initiation of this litigation; and,

f.  Such other relief as this Honorable Court may direct.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff Sercer respectfully demands a Trial by Jury on all aspects of her Complaint and claims.

Respectfully submitted,

_____

MICHAEL W. BEASLEY, ESQ.
Virginia State Bar No. 30872
Attorney for Plaintiff Angela M. Sercer
Law Offices of Michael W. Beasley
200 Park Avenue, Suite 106
Falls Church, VA  22046
Phone:  (703) 533-5875; Cell Phone (703) 994-2524
Fax:  (703) 533-5876; E-Mail: mwbeasley@verizon.net

December 17, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December, 2014, I will electronically file

the foregoing with the Clerk of the Court using the CM/ECF system, which will transmit

a Notice of Electronic Filing to Defendant's counsel at:

Dana J. Boente, United States Attorney
Kimere J. Kimball, Esq., Assistant U. S. Attorney
Ayana Free, Esq., Assistant U. S. Attorney
United States Attorney for the Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia  22314
E-Mails:  "kimere.kimball@usdoj.gov"
          "ayana.free@usdoj.gov"
Attorneys for Defendant


    /s/                               
MICHAEL W. BEASLEY, ESQ.
Virginia State Bar No. 30872
Attorney for Plaintiff Angela M. Sercer
Law Offices of Michael W. Beasley
200 Park Avenue, Suite 106
Falls Church, VA  22046
Phone:  (703) 533-5875; Cell Phone (703) 994-2524
Fax:  (703) 533-5876; E-Mail: mwbeasley@verizon.net